IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CARDIOVASCULAR SUPPORT,   )
ET AL.,   )
   )
       Plaintiffs,   )
   )
v.   )   NO. 3:13-CV-1171
   )   JUDGE CAMPBELL
SPECIALTYCARE, INC.,   )
ET AL.,   )
   )
       Defendants.   )

## MEMORANDUM

Pending before the Court are Plaintiffs' Motion for Partial Summary Judgment (Docket No. 85) and Defendants' Motion for Summary Judgment (Docket No. 73). For the reasons stated herein, the Court will DENY Plaintiffs' motion and GRANT Defendants' motion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts set forth below are undisputed unless otherwise indicated. Plaintiffs (collectively referred to as "Cardiovascular Support") provide perfusion services and perfusion-related goods to various hospitals in Texas. Defendants (collectively referred to as "SpecialtyCare") provide a variety of clinical services, including perfusion services, to hospitals across the country. Perfusion services are provided to patients who are having open-heart surgery. The perfusionist operates the heart/lung bypass machine, which provides life support to a patient during open heart surgery.

On December 9, 2010, Cardiovascular Support and SpecialtyCare entered into a non-disclosure agreement, the purpose of which was to protect Cardiovascular Support as it provided SpecialtyCare's mergers and acquisitions team with qualified access to its confidential business information so that SpecialtyCare could evaluate a possible investment, acquisition, divestiture,

merger, or other strategic acquisition of Cardiovascular Support. Ultimately, no such transaction occurred.

At the time the non-disclosure agreement was executed, Cardiovascular Support had an existing contract to provide perfusion services and products to Baylor University Medical Center ("Baylor") in Dallas County, Texas. Cardiovascular Support's contract with Baylor expired in mid-2011, about the same time that Cardiovascular Support and SpecialtyCare entered into the non-disclosure agreement. Cardiovascular Support attempted to negotiate a new contract with Baylor. Lloyd Yancey was the individual with Cardiovascular Support who was responsible for negotiations with Baylor. Mike Sanborn, Baylor's Vice President of Cardiovascular Services, handled the negotiations for Baylor, although there were other decision makers at Baylor as well.

Baylor was satisfied with Cardiovascular Support's perfusionist services but felt that it could save money by purchasing its own supplies. Sanborn Dep. 8–9 (Docket No. 65-1). Baylor considered bringing both services and supplies in house, and extended Cardiovascular Support's contract by ninety days to allow time to hire its own perfusionists. Sanborn Dep. 11, 13. When it encountered difficulty with bringing perfusionist services in house, Baylor next considered seeking a service-only contract in which it contracted with an outside company for perfusionist services, with the intention to purchase its own supplies in order to save money. Sanborn Dep. 15.

At some point in this process, Baylor learned that one of its affiliate hospitals in another city already had a service-only contract with SpecialtyCare. Indeed, Jonathan Womack, who was the Vice President of Sales for SpecialtyCare and its various predecessors-in-interest, testified that he had been trying to get SpecialtyCare "in the door at Baylor for a while before 2011." Womack Dep. 29 (Docket No. 70). Baylor solicited a service-only bid from SpecialtyCare. Sanborn Dep. 18. Mr.

Sanborn, who handled this matter for Baylor, testified that Baylor had a standardized form with the information it wanted included in the bid. Sanborn Dep. 20. SpecialtyCare used Baylor's form to create its proposal. Baylor liked SpecialtyCare's proposal, which in addition to having the benefit of being a services-only bid, also included monitoring, bench marking, and some other services Baylor was not currently getting from Cardiovascular Support, such as blood management. Sanborn Dep. 24.

At the same time Baylor was exploring the possibility of entering into a services-only contract with SpecialtyCare, Mr. Sanborn was also considering the possibility of Baylor's continuing to contract for perfusionist services with Cardiovascular Support. The primary point of negotiation between Baylor and Cardiovascular Support was whether, and how much, Cardiovascular Support would lower its charges for supplies. At Mr. Sanborn's request, Cardiovascular Support created a proposal that would eliminate about one million dollars of expenses from supplies. However, Mr. Sanborn did not like that the bid was on a flat-fee basis, which he thought would not be financially advantageous to Baylor. Sanborn Dep. 16. In response to Baylor's stated desire to purchase its own supplies, Cardiovascular Support indicated it would be willing to enter a contract in which Baylor would purchase its own heart valves only if Baylor paid Cardiovascular Support a ten percent handling fee and agreed to disclose the pricing it received from the manufacturers of the heart valves. Yancey Dep. 115 (Docket No. 64). As Mr. Yancey himself testified on behalf of Cardiovascular Support, Baylor was not comfortable with that proposal because Baylor had confidentiality agreements with its vendors. Yancey Dep. 115. The discussions between Cardiovascular Support and Baylor were all verbal. The parties never exchanged draft agreements related to the contract renewal. Yancey Dep. 116. Mr. Yancey testified that Mr. Sanborn assured him that Cardiovascular Support

would not lose the contract for services, as Baylor was only considering changing the way it obtained supplies. Yancey Dep. 117. Mr. Sanborn testified, to the contrary, that he "would not have made that statement." Sanborn Dep. 16. In any event, Mr. Sanborn testified that Cardiovascular Support's proposals were not "adequate" and that Baylor was "not prepared to move forward with the renewal." Sanborn Dep. 18. He further testified that there was "zero chance" Baylor would renew the contract as written because of Baylor's "significant amount of concern over the pricing of the supplies." Sanborn Dep. 10. On October 14, 2011, Baylor and SpecialtyCare entered into a services-only contract, with services to begin December 1, 2011.

The gravamen of Plaintiffs' complaint is that SpecialtyCare's merger and acquisitions team disclosed Plaintiffs' confidential information to its sales team, which in turn improperly used the confidential information to obtain the contract with Baylor for provision of perfusionist services. Defendants dispute both the allegation that their merger and acquisitions team gave the confidential information to the sales team and also that it used the confidential information in creating its proposal for the Baylor contract.

On March 29, 2013, Cardiovascular Support brought this action in state court in Dallas County, Texas. On May 6, 2013, Defendants removed the case to the United States District Court for the Northern District of Texas on the basis of diversity of citizenship, pursuant to 28 U.S.C. § 1332. Plaintiffs are citizens and residents of the State of Texas. Defendant companies were incorporated in states other than Texas and have their principal places of business in Tennessee. On May 28, 2013, Plaintiffs filed an Amended Complaint. On October 22, 2013, this action was transferred from the Northern District of Texas to this Court by agreement of the parties.

4

Plaintiffs assert claims for breach of contract, promissory estoppel, fraud, negligent misrepresentation, tortious interference with prospective relations, and trade secret misappropriation. Defendants raise defenses of statute of limitations, contributory negligence, comparative negligence of third parties, failure to mitigate damages, release, waiver, estoppel, laches, unclean hands, and accord and satisfaction.

Plaintiffs move for summary judgment as to liability on each of its claims, but not as to damages. They also move for summary judgment as to each of Defendants' defenses. Defendants move for summary judgment dismissing all claims in Plaintiffs' First Amended Petition.

## ANALYSIS

### I. Summary Judgment Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence

in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.     Choice of Law

"Because this is a diversity action, the law of the forum state, including the choice-of-law rules, apply*." Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009). "In Tennessee, the 'construction and validity of a contract are governed by the law of the place where the contract [wa]s made.'"*Baxter Bailey Investments, Inc. v. Mars Petcare US, Inc.,* No. 11-2860-STA-DKV, 2012 WL 1965612, at *3 (W.D. Tenn. May 31, 2012) (quoting *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 466 (Tenn. 1973)). As the Tennessee Court of Appeals has held:

> Tennessee follows the rule of *lex loci contractus*. This rule provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent contrary intent. If the parties manifest an intent to instead apply the laws of another jurisdiction, then that intent will be honored provided certain requirements are met. The choice of law provision must be executed in good faith. The jurisdiction whose law is chosen must bear a material connection to the transaction. The basis for the choice of another jurisdiction's law must be reasonable and not merely a sham or subterfuge. Finally, the parties' choice of another jurisdiction's law must not be contrary to a fundamental policy of a state having a materially greater interest and whose law would otherwise govern.

*Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999) (internal quotation marks, brackets, citations omitted).

Plaintiffs bring claims that sound in contract and tort, and the Court must consider which state's law to apply to these different categories of claims. The non-disclosure agreement at issue in this matter contains the following choice of law provision: "This Agreement shall be construed in

accordance with the laws of the State of Delaware." Docket No. 7, at 18 (Exhibit to First Amended Petition). The parties are in agreement that Delaware law governs the breach of contract claim in this case. There is no indication that the contract was entered into in bad faith and neither party has pointed to any evidence that their choice of Delaware law was a sham or that it is contrary to a fundamental policy of a state having a materially greater interest whose law would otherwise govern. Other than the fact that one of the Defendant companies was incorporated in Delaware, the parties do not address the manner in which this transaction is materially connected to the state of Delaware. Because the other factors are easily met, the parties are in agreement that Delaware law governs the breach of contract claim, and there does not appear to be a conflict of laws on this legal issue, the Court will apply Delaware law to the breach-of-contract claim.

However, the non-disclosure agreement's choice of law clause is narrowly written to cover only the interpretation of the contract, not the entirety of the relationship between the parties. Other than Plaintiffs' breach of contract claim, the remainder of Plaintiffs' claims sound in tort, to which the Court will apply Tennessee's choice of law rules. Tennessee applies the "most significant relationship" test set forth in the Restatement (Second) of Conflicts of Laws to determine which law applies to those claims. *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992). This test considers the place of the injury, the place where the conduct causing the injury occurred, the place of incorporation or place of business of the parties, and the place where the relationship is centered. *Id.* In cases in which it is unclear which state possesses the most significant relationship, "[t]he applicable law will usually be the local law of the state where the injury occurred." Restatement (Second) of Conflicts of Law § 156(2) (1971). Plaintiffs alleged injury in this matter is economic

loss, which occurred in Texas, the location of Plaintiffs' principal place of business. Thus, the Court will apply Texas law to Plaintiffs' tort claims.[1]

A conflict of law exists with respect to Plaintiffs' trade-secret misappropriation claim. Tennessee enacted the Uniform Trade Secrets Act (the "Act") in 2000 (*see* Tenn. Code Ann. § 47-25-1701). In contrast, while Texas adopted the Act effective September 1, 2013, the pre-Act Texas common law applies to any alleged misappropriation that occurred before that effective date. (*See* Tex. Civ. Prac. & Rem. Code Ann. § 134A.001, historical and statutory notes). Because of differences between the Act and Texas common law with respect to the definition of a "trade secret" and also with respect to the types of damages methodologies available, the Court will apply Texas law, as it is the state with the most significant relationship to this claim.

## III.    Breach of Contract

Under Delaware law, the elements of a breach of contract claim are as follows: "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). After thorough review of all the evidence Plaintiffs argue supports their claim, the Court finds that Plaintiffs have no evidence that Defendants breached the non-disclosure agreement. The deposition testimony to which Plaintiffs direct the Court's attention, in support of their motion and in opposition to Defendants' motion, all consists of unsupported assumptions. In essence, Plaintiffs' witnesses testify that the mergers and acquisitions section of SpecialtyCare "must have" shared Plaintiffs' confidential information with its sales division, which in turn used the information to craft its proposal to Baylor.

---

[1] The parties are in agreement that Texas law applies to Plaintiffs tort claims.

Even if the dispute between the parties about whether the mergers and acquisitions section of SpecialtyCare shared Plaintiffs' confidential information with the sales division were genuine, a question the Court need not reach, that dispute is not material to Plaintiffs' claims. There is simply no evidence from which a reasonable jury could conclude that Defendants used Plaintiffs' protected information to steal the Baylor contract from them. The most specific allegation Mr. Yancey, who negotiated the Baylor contract for Plaintiffs, could make in deposition, was the following: "[A]ll the salaries [in Defendants' bid to Baylor] looked a little bit higher than what [Defendants] were paying their staff perfusionist in Fort Worth or for the most part. They knew exactly what all of my people were making, and they adjusted it up." Docket No. 72-1, at 118. This statement, as with the other evidence presented by Plaintiffs, is pure speculation.

Mr. Sanborn, in charge of contract negotiations for Baylor, testified that he made the decision to solicit a proposal from Defendants and that Baylor provided all the information necessary for the proposal. Defendants had contracts with other hospitals in Texas for perfusionist services and had been trying for several years to get a contract with Baylor. Mr. Womack, who handled the Baylor negotiations, testified that he did not receive Plaintiffs' confidential information from anyone within his office, nor did he use any confidential information in preparing the Baylor proposal. Plaintiffs have presented nothing but insinuation and speculation to contradict his unequivocal testimony on this issue.

Furthermore, the Court agrees with Defendants that Plaintiffs cannot prove that Baylor would have contracted with Plaintiffs but for Defendants' actions. It is clear from Mr. Sanborn's testimony that Baylor was dissatisfied with Cardiovascular Support's proposed renewal contract, even after it reduced the cost of supplies by one million dollars. Docket No. 65, at 9–10, 16–18. Mr. Yancey

testified that Cardiovascular Support proposed a contract in which Baylor would purchase its own heart valves, but only if Baylor paid it a ten-percent handling fee and agreed to disclose the pricing it received from the manufacturers of the heart valves. Docket No. 64-1, at 115. As Mr. Yancey himself testified, Baylor was not comfortable with that request because it had confidentiality agreements with its vendors. Id. It is clear from Mr. Yancey's *own* testimony that Baylor was not pleased with Cardiovascular Support's proposal. Baylor was seeking a services-only contract, which Mr. Sanborn believed was not an option with Cardiovascular Support and for which, in fact, Cardiovascular Support never submitted a proposal. Mr. Sanborn testified that "[t]here was zero chance that [Baylor] would renew [Cardiovascular Support's] contract as written."

Without proof of a breach of contract or damages therefrom, Plaintiffs' have not established that they are entitled to judgment on this claim. In contrast, Defendants have demonstrated entitlement to judgment on this claim.

## IV.      Promissory Estoppel

Because Defendants have conceded that the non-disclosure agreement is a valid contract between the parties, the Plaintiffs, in turn, concede that their claim for promissory estoppel fails. Defendants are entitled to judgment in their favor on this claim.

## V.      Fraud and Negligent Misrepresentation

Under Texas law, "[a] fraud cause of action requires a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).

Under Texas law, the elements of negligent representation are:

(1) a defendant provides information in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the information supplied is false; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; (4). the plaintiff justifiably relies on the information; and (5) the plaintiff suffers damages proximately caused by the reliance.

*Larsen v. Carlene Langford & Assocs, Inc*., 41 S.W.3d 245, 249–50 (Tex. Ct. App. 2001).

Plaintiffs claim that Defendants did not intend to perform the promises of the non-disclosure agreement at the time the promises were made, intending instead to use the confidential information to compete with Plaintiffs for the Baylor perfusionist contract. They further claim that Defendants' sales team members obtained their confidential information from Defendants' merger and acquisitions team, and used the confidential information to create their competing bid. Plaintiffs have no evidence from which a reasonable jury could conclude that Defendants made a material misrepresentation or otherwise gave false information to Plaintiffs. For the same reasons that Plaintiffs cannot prevail on their breach of contract claim, they also fail to present evidence sufficient to establish that Defendants used Plaintiffs' information to create their bid to Baylor. Plaintiffs also cannot prove that Defendants' actions caused them injury– that is, that Defendants' actions were the proximate cause of Plaintiffs' failure to obtain the contract with Baylor. Accordingly, the Court will deny Plaintiffs' motion for summary judgment on this claim, and grant summary judgment to Defendants.

## VII.     Tortious Interference with Prospective Relations

Under Texas law, to prevail on a claim for tortious interference with prospective contracts the plaintiff must prove the following:

> (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an "independently tortious or unlawful" act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

*Faucette v. Chantos*, 322 S.W.3d 901, 914 (Tex. App. 2010).

Plaintiffs have failed to present evidence to support the first, second, or fourth of these elements. As to the third element, Defendants had every right to pursue a contract with Baylor. As the Texas Supreme Court has held, "when two parties are competing for interests to which neither is entitled, then neither can be said to be more justified or privileged in his pursuit. If the conduct of each is lawful, neither should be heard to complain that mere unfairness is actionable." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 727 (Tex. 2001). Defendants are entitled to judgment on this claim.

## VIII. Trade Secret Misappropriation

To state a claim for trade secret misappropriation under Texas law, "a plaintiff must (1) establish that a trade secret existed; (2) demonstrate that the trade secret was acquired by the defendant through a breach of a confidential relationship or discovered by improper means; and (3) show that the defendant used the trade secret without authorization from the plaintiff. . . . The existence of a trade secret is properly considered a question of fact to be decided by the judge or jury as fact-finder." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 149–50 (5th Cir. 2004).

To determine whether something constitutes a trade secret protected from disclosure or use, Texas courts examine six "relevant but nonexclusive criteria."

(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.*

Plaintiffs argue that all the confidential information given to Defendants, as defined by the non-disclosure agreement, constitutes a trade secret. This includes employment agreements, entity names, W-9 forms, tax forms, e-mails between SpecialtyCare and Cardiovascular Support, internal e-mails, SpecialtyCare's financial analysis of Cardiovascular Support information, Cardiovascular Support's financial statements and tax returns, and notes of phone calls. Plaintiffs offer no case law to support the proposition that information is legally protected as a trade secret by virtue of the fact that the parties to a contract have defined it as "confidential information." Furthermore, there is no evidence that Plaintiffs expended any effort or money in developing the information beyond the effort required by any business to prepare its financials, tax forms, and business documents. There is no evidence that Plaintiffs made its employees sign confidentiality agreements with respect to this information. It is unclear that any of Plaintiffs' information constitutes a trade secret. But even assuming Plaintiffs' confidential information constituted legally-protected trade secrets, for reasons already articulated, Plaintiffs do not have sufficient evidence to demonstrate the second or third elements of a trade-secret misappropriation claim. Accordingly, the Court will deny Plaintiffs' motion for summary judgment on this claim and grant Defendants' motion.

**CONCLUSION**

For the foregoing reasons, the Court will  DENY Plaintiffs' Motion for Partial Summary Judgment (Docket No. 85) and GRANT Defendants' Motion for Summary Judgment (Docket No. 73). The Court will enter judgment in favor of Defendants as to all claims in Plaintiffs' Amended Complaint.

An appropriate order is filed herewith.

_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE